# IN THE COURT OF APPEALS OF IOWA

No. 13-1067
Filed August 27, 2014

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**EZRA JAVON JAMES,**
　　　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Henry W. Latham II, Judge.

Ezra James appeals from judgments and sentences entered upon his convictions of willful injury resulting in serious injury, assault with intent to inflict serious injury, intimidation with a dangerous weapon with intent, and two counts of assault while displaying a weapon. **AFFIRMED IN PART, REVERSED AND REMANDED FOR NEW TRIAL IN PART, JUDGMENTS AND SENTENCES VACATED, AND REMANDED FOR RESENTENCING.**

Mark C. Smith, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Heather Ann Mapes, Assistant Attorney General, Michael J. Walton, County Attorney, and Jerald R. Feuerbach, Assistant County Attorney, for appellee.

Considered by Potterfield, P.J., and Tabor and Mullins, JJ.

**POTTERFIELD, P.J.**

Ezra James appeals from judgments and sentences entered upon his convictions of willful injury resulting in serious injury, assault with intent to inflict serious injury (the jury finding him guilty of a lesser-included offense of the charge of attempted murder), intimidation with a dangerous weapon with intent, and two counts of assault while displaying a weapon. On appeal, James maintains there is not sufficient evidence that he "caused . . . injury" to Jasman Clark or Marques Jones to sustain the conviction of willful injury resulting in serious injury (count 1). He maintains that if there is sufficient evidence, the conviction of assault with intent to inflict serious injury (count 2, which related solely to the shooting of Jasman Clark) should have been merged with the conviction of willful injury resulting in serious injury (count 1), which the court instructed the jury must be proved as having been committed against "Jasman Clark or Marques D. Jones."

He also contends the convictions of assault while displaying a weapon (counts 4 and 5)—not just the sentences for those counts—should have been merged with the conviction of intimidation with a dangerous weapon (count 3), which was alleged to have been committed against "Jasman Clark and Marques D. Jones."

While we conclude there was evidence from which a rational juror could determine James caused injury to Jones, there is only speculation that James caused injury to Clark. Because the jury was instructed on count 1 that they could find the defendant guilty if they found the "defendant's acts caused a bodily

injury to Jasman Clark *or* Marques D. Jones," the general verdict cannot stand,[1] nor can the merger of the sentence on count 2 with count 1. The State concedes the convictions on counts 4 and 5 merge with the conviction on count 3. We affirm in part, reverse in part, and remand with instructions.

**I. Background Facts and Proceedings.**

At about 3:45 a.m. on November 17, 2012, officers were sent to Jasman Clark's residence upon receiving reports of shots fired. When officers arrived, there were several people in the front yard. Clark was found lying on the ground outside of his home, bleeding from his forehead. There was a .357 Magnum revolver by his side—two of the five rounds in the chamber of the revolver had been fired; no fingerprints were found on the gun. Marques Jones was found inside Clark's house with a bullet wound in his leg.

Jones informed officers there had been a party going on when Clark started looking for his cell phone. Clark asked Ezra James, who was in the living room with Jones and Clark, if James had seen the phone. James took offense, and Clark asked him to leave. James left the house. Clark and Jones then heard a disturbance outside, and Clark went to check on it, telling Jones to stay inside. Jones waited less than a minute and then went outside. Jones then saw James near a green Pontiac in the middle of the street. Jones stated James opened the back door of the car, leaned down, and turned back around and

---

[1] This case is significantly different from *Griffin v. United States*, 502 U.S. 46 (1991), and its progeny, in which a general verdict followed a jury instruction providing varying theories of commission of a single crime. In *Griffin*, 502 U.S. at 56, the Supreme Court held a general verdict need not be set aside "because one of the possible bases of conviction was . . . unsupported by sufficient evidence." Here, the jury was not instructed on different means of committing an offense, but on two separate crimes in the same instruction—willful injury against Clark and willful injury against Jones.

toward him holding an automatic handgun. Jones turned to run back inside and was shot. Jones was dragged into the kitchen. When Officer Donnie Pridemore came across Jones in the kitchen, Jones described the person he saw with the gun as a dark-skinned male with dreadlocks and facial hair. He described the gun he saw—an automatic pistol, a "flash from something shiny off of it." (Officer Pridemore would testify Jones stated it was a silver pistol with an "extended clip.") Jones testified that, besides seeing the gun in the person's hand, he did not see any other guns that night—including the black revolver that police located in the front yard.

Several witnesses testified they heard four to five gunshots. Samantha Byers, a neighbor, stated she was in her bedroom when she heard gunshots and saw people running as she looked out her window.[2]

Another neighbor, David Mathis, also looked out his window after hearing gunshots and saw a male with dreadlocks standing by his silver Volvo. The man appeared to be holding a handgun; it was raised as if pointing the gun, but Mathis saw no shots fired.

John Rahmatulla, also a neighbor, heard a gunshot. He testified:

I leapt to my feet, opened my blinds and looked out. I could see what appeared to be the fire or a flame coming out of a gun. Now, I quite often run into the face of danger, so I ran downstairs immediately. Upon opening my door, I saw a black man with a pistol pointed down the street in the direction of [Clark's] house. I should say more specifically pointed down the sidewalk—I should

---

[2] Byers stated she saw two people headed north on Marquette, but the only thing she could describe "was like a beanie and then it had a like a ball on top of it, his hat. Kind of like a winter hat." She then stated she saw a person "[r]un on 14th." Officer Fury testified he saw two people (whom he later identified as Ezra James and Fred James) walking north on the west side of Marquette Street. He described Fred James as wearing a stocking hat.

not say at his house, but down the sidewalk direction. There was a person running away from this person. And again there was approximately three more shots. He was standing in front of what I would believe to be a black small sedan. As I screamed, the shooting stopped, I then ran back inside the house because the woman that I live with came running down the stairs. I pushed her back in the house and we both went upstairs. That ends my tale.

On cross-examination, Rahmatulla explained the person with the gun was on the sidewalk and the car the person was near was parked on the side of the street.

Nate Fisher, a neighbor across the street from Clark's house, testified he woke up to "a bunch of people outside yelling and screaming." He saw three muzzle flashes and "[a]fter three, I picked up the phone and called the cops." He was asked if the muzzle flashes came from different directions. Fisher stated, "They were just all in that group right there."

Responding to the shots-fired call, Officer Eric Gruenhagan observed one individual running towards a stopped green four-door Oldsmobile a few blocks away from the party. The individual got in, and the car moved away. Officer Gruenhagen stopped the vehicle and eventually learned the two passengers in the back seat were Elaesha Morton and Eric James. No guns were located in the vehicle or on any of the occupants.

Officer John Fury conducted an investigative stop of two males walking a few blocks from the party, one of whom was Ezra James. Officer Fury stated the two were sweating profusely though it was cool out. James gave a false name to the officer. No weapons were found on either man.

A photograph of Ezra James was taken on the morning of the shots-fired incident, and the photograph was used in a photo lineup shown to Jones. Jones

identified Ezra James as the man who shot him but stated the man had a little more facial hair in the picture.

Police officers recovered two spent .45 caliber casings, as well as two unfired .45 caliber rounds. One of the fired shell casings was found in the street in front of Clark's house, and the second fired shell casing was found underneath a car parked in front of the address. One of the unfired rounds was found just next to Clark's body in the front lawn. The other unfired round was found in the street, two to three car lengths down and on the opposite side of the street from the fired shell casings. Despite a search of the house, the yard, and the neighborhood, no .45 caliber weapon was located on the morning of the shooting.

More than two months later, on January 20, 2013, police were investigating a burglary involving Shane Smeltzer, and while executing a search warrant, located a handgun in the rafters of a garage. Smeltzer stated he purchased the gun from Clayton Reed. Reed, who lived at the corner of 15th and Marquette Streets—one block east and one block north of Jasman Clark's address—told law enforcement he found the semi-automatic handgun with an extended clip under the top tire of a stack of several large tires in an alleyway during the first snow of the winter, which he thought was after Christmas 2012. Reed stated he kept the weapon for about three to four weeks and then sold the gun and clip to Smeltzer. Officer James Stark had seen a stack of tires on the night of the shooting and had looked inside the stack but saw no weapon. The spent .45 cartridge shells that were found near Clark's residence on November 17 were determined to have been discharged from this weapon. At trial, there

was testimony that when a semi-automatic handgun round is fired, the spent shell casing is ejected and would be found near where the weapon was fired. Police found no bullet that may have injured either Jones or Clark.

James was charged with willful injury causing serious injury (count 1), attempt to commit murder (count 2), intimidation with a dangerous weapon (count 3), and two counts of assault while displaying a weapon (counts 4 and 5).

At trial, Clark could not state how he was injured and denied having a gun.

Elaesha Morton testified that everyone in her group of people went to Clark's house after the bars closed, though they drove in separate cars. Morton; her "best friend" Eric James; and two women, Jaylin and Raven, drove to Clark's house in a green Buick belonging to either Jaylin or Raven. She stated cousins Ezra James and Fred James rode separately with another mutual friend. Morton testified that about twenty to thirty minutes after she arrived at the party at Clark's, she and others were sitting on a couch inside the house listening to music when Clark could not find his cell phone. Clark started "flipping out." Clark's brother, B.J., was drunk and was going around checking everybody's pockets. B.J. tried to check Ezra James's pockets, but James got upset and told B.J. he shouldn't be touching him. James and B.J. were verbally arguing when a friend of Clark's, whom Morton did not know but who was wearing a green shirt,[3] swung and tried to hit James. She stated that at that point, everybody went outside.

Morton stated that once outside, James and B.J. were on the sidewalk by the curb arguing back and forth and getting ready to fist fight. Clark was in the

---

[3] Jones had on a green shirt that night.

front of the house arguing with brothers, Eric and Fred James. While everyone was arguing outside, two male friends of Clark's (one wearing plaid and the other wearing a black t-shirt) pulled up in front of the house in a black SUV. The men from the SUV yelled something friendly at Clark and yelled something threatening to everybody else. Morton stated that at that time, Clark was holding the black handgun, which was shown in exhibit 27—a photograph of the .357 Magnum. She testified Eric James was holding a shiny handgun, and at least one of the men from the black SUV had a black gun. Morton testified that when Ezra James was talking and arguing with B.J., she did not see anything in Ezra's James's hands. Morton testified that Clark fired two gunshots into the air. At the time Clark fired the shots, Eric James had the shiny gun in his hand. Ezra James was not in Morton's field of sight at that time, and she did not see him again after Clark shot into the air. Morton testified that when she last saw Ezra James, he was on the sidewalk by somebody else's car, not the green Buick Morton had arrived in. After Clark fired shots into the air, Morton ran and got inside the green Buick that was parked in front of the house. Morton testified that Eric James ran to the car as well. Once Morton was inside the green car, she started looking around and saw Clark fall "and that's when all the other gunshots fired." Morton did not see Ezra James at that time. Morton testified that Eric James took off running away from the green car, and Morton followed running behind him. Morton did not see Eric James shoot his gun. She also did not see what happened to the gun that she had seen in Eric's hand. Morton denied that she and Eric stopped and hid the gun anywhere.

The court submitted the case to the jury following trial, after denying James's motion for judgment of acquittal asserting there was insufficient evidence that he caused injury to Clark or Jones. The jury returned guilty verdicts on counts 1, 3, 4, and 5, and on a lesser-included offense of count 2.

James sought a new trial, contending the verdicts were against the weight of the evidence and errors were made in rulings on the admissibility of evidence. Concerning the weight of the evidence, James argued,

> [T]he State was only able to produce one witness that identified James as the shooter. In fact that witness, Marques Jones, was only able to identify James as the person who shot the witness and could not identify James as the person who shot Clark. No other witness could identify the person that shot Clark.
>     . . . .
>     The testimony of Marques Jones and Jasman Clark should be discounted based upon demonstrated lack of credibility. The testimony of all other witnesses, including Elaesha Morton, should be given credible weight and consideration as they are witnesses offered in support of the Defendant's lack of involvement in the incident involving the shooting of Marques Jones and Jasman Clark. If the Court then discounts the testimony of the aforementioned, then the verdicts in the above-captioned causes are contrary to the evidence, and as such, a motion for new trial should be granted to the defendant.

The district court denied the motion for new trial, entered judgment, and imposed sentences. On count 1, willful injury causing serious injury, the court imposed a term of incarceration not to exceed ten years; on count 2, assault with intent to inflict serious injury, a term not to exceed two years; and concluded the "sentence imposed under count 2 merges with the sentence imposed under count 1." The court also imposed a prison term not to exceed ten years on count 3, which was to run consecutive to the sentence imposed on count 1, and the

court also imposed two, two-year terms on counts 4 and 5, which the court merged with the sentence on count 3.

James appeals, contending there was not sufficient evidence to sustain the conviction for willful injury (count 1); or in the alternative, James argues the guilty verdict on count 1 was against the weight of the evidence. He also argues the district court entered an illegal sentence in imposing judgment on the two convictions for assault while displaying a weapon (counts 4 and 5), in addition to the conviction for intimidation by dangerous weapon (count 3). Finally, James argues the district court entered an illegal sentence in merging only the sentences, and not the convictions, for count 1 and count 2.

**II. Scope and Standard of Review.**

We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014).

We review constitutional claims, including claims of ineffective assistance of counsel, de novo. *State v. Showens*, 845 N.W.2d 436, 440 (Iowa 2014).

**III. Discussion.**

*A. Sufficiency of the evidence—count 1.* On appeal, James contends there is insufficient evidence that he "caused . . . injury" to either Jones or Clark to sustain the conviction for willful injury resulting in bodily injury. He argues "[t]he evidence presented at trial . . . was insufficient to establish that the shots that actually struck the victims came from the .45 caliber weapon allegedly wielded by James."

> Sufficiency of evidence claims are reviewed for . . . correction of errors at law. In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record

evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpatory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

*Thomas*, 847 N.W.2d at 442 (citation and internal quotation marks omitted).

### 1. *"Caused . . . injury" to Jones*.

The State contends James did not preserve error with respect to this claim as it relates to injury to Jones because when trial counsel moved for judgment of acquittal, it was with reference to the shooting of Clark. James urges that trial counsel's motions were sufficient to preserve a sufficiency challenge to the "caused . . . injury" element of the count 1 charge as to both victims Clark and Jones. In the alternative, James argues that to the extent error was not properly preserved as to Jones on the count 1 charge, that we consider the issue under the ineffective-assistance-of-counsel framework.[4]

"To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal." *State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004). In this case, trial counsel for James moved for a judgment of acquittal at the close of the State's case specifically arguing the

---

[4] We do not disagree with the principles enunciated in the special concurrence. However, the ineffective-assistance-of-counsel claim made on appeal references the adequacy of counsel's preservation of the challenge to the sufficiency of the evidence and not to the jury instructions. "We do not subscribe to the plain error rule in Iowa, have been persistent and resolute in rejecting it, and are not at all inclined to yield on the point." *State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999).

evidence was insufficient to establish that James was the shooter of Clark and that the evidence failed to establish what "weapon or . . . caliber" shot Clark. At the close of all evidence, trial counsel renewed the motion but, this time, challenged the sufficiency of the evidence on all counts, not only those counts on which Clark (rather than Marques Jones) was the designated victim. On appeal, James contends there is insufficient evidence that he caused injury to either Jones or Clark to sustain the conviction for willful injury resulting in bodily injury.

In light of our ruling on the sufficiency of the evidence as to Jones, we will pass on the preservation issue because even if not properly preserved, trial counsel is not required to raise a meritless issue and thus James cannot prove counsel was ineffective. *See State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013) ("'We will not find counsel incompetent for failing to pursue a meritless issue.'" (citation omitted)).

When reviewing the evidence in the light most favorable to the State, a jury could reasonably conclude James caused injury to Jones. The evidence presented from a number of witnesses was that James was involved in a dispute with Jones and Clark shortly before the shooting. Witnesses also identify James as being present at the scene of the crime. Jones, who was shot, identified James as a person displaying a handgun an instant before shots were fired. Witnesses who were at different locations describe a person with dreadlocks pointing a gun in the direction of the house and shots fired. There was no testimony that anyone specifically saw James fire a weapon, but considering the totality of the evidence in this case, including permissible inferences that can be drawn, a rational juror could find James caused injury to Jones. *See* Iowa R.

App. P. 6.904(3)(p) ("Direct and circumstantial evidence are equally probative."). There is sufficient evidence from which a rational juror could determine James caused injury to Jones.

### 2. "Caused . . . injury" to Clark.

But we are not convinced the same can be said with respect to Clark. We view the evidence presented at trial in the light most favorable to the State, but "the evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2013) (alterations, quotation marks, and citation omitted). Jones did testify Clark was about five feet away from him when Jones came outside. But he did not see shots fired. Morton stated Clark was in the front of the house arguing with Eric and Fred James, and Eric James was holding a shiny handgun. After hearing shots, Mathis saw a man with dreadlocks standing by a silver Volvo with a handgun. Rahmatulla testified he observed a man near a dark sedan pointing a gun down the sidewalk toward Clark's house. Several shots were heard. But no one testified they saw Clark get shot. Morton and Kristianna Haynes testified they saw other people with guns. Morton testified she "ran in the car, was looking around, and then he [Clark] fell and that's when everybody started shooting." Clark denied having a gun, but a gun other than a .45 caliber was found next to him. There was no direct or circumstantial evidence of how Clark was wounded. We cannot uphold a verdict based on nothing more than speculation. *See id.* at 162-63.

### 3. Retrial required.

With respect to count 1, the jury was instructed:

Under Count 1 the State must prove all of the following elements of Willful Injury Resulting in Bodily Injury.

1. On or about 17th day of November 2012, the defendant shot Jasman Clark *or* Marques D. Jones.

2. The defendant specifically intended to cause a bodily injury to Jasman Clark *or* Marques D. Jones.

3. The defendant's acts caused a bodily injury to Jasman Clark *or* Marques D. Jones as defined in Instruction No. 40.

If you find the State has proved all of the elements, the defendant is guilty of Willful Injury Resulting in Bodily Injury under Count 1. If the State has failed to prove any one of the elements, the defendant is not guilty of Willful Injury Resulting in Bodily Injury, and you will then consider the charge of Assault Resulting in Serious Injury explained in Instruction No. 19.

(Emphasis added.)

Submission of multiple alternatives to the jury is permissible only if substantial evidence is presented to support each alternative method of committing a single crime. *State v. Bratthauer*, 354 N.W.2d 774, 776 (Iowa 1984). Because there was not substantial evidence to support the alternative that James caused injury to Clark, the submission of the alternative was in error.

We have recognized . . . if the instructions allow the jury to consider multiple theories of culpability, only some of which are supported by the evidence, and a general verdict of guilty is returned, a reversal is required because "we have no way of determining which theory the jury accepted."

*State v. Williams*, 674 N.W.2d 69, 71 (Iowa 2004) (quoting *State v. Hogrefe*, 557 N.W.2d 871, 880-81 (Iowa 1996)); *see also State v. Lathrop*, 781 N.W.2d 288, 297 (Iowa 2010) ("When circumstances make it impossible for the court to determine whether a verdict rests on a valid legal basis or on an alternative invalid basis, we give the defendant the benefit of the doubt and assume the

verdict is based on the invalid ground."). We reverse the conviction on the charge of willful injury and remand for new trial as related to Jones only.[5, 6]

*B. Merger of two convictions of assault while displaying a weapon with conviction of intimidation with a dangerous weapon.*

The jury found James committed the offense of intimidation with a dangerous weapon with intent against "Jasman Clark and Marques D. Jones" under count 3, in violation of Iowa Code section 708.6 (2011). In addition, the jury found James guilty of two counts of assault while displaying a weapon—one against Clark (count 4) and one against Jones (count 5). As instructed, the jury necessarily found James "displayed a dangerous weapon in a threatening manner." *See* Iowa Code § 708.1(2)(c) (stating one commits assault when one "intentionally points any firearm toward another, or displays in a threatening manner any dangerous weapon toward another").

Iowa Code section 708.2, the statute describing penalties for degrees of assault, specifically provides that punishment for assault with a dangerous weapon is inapplicable where a person is convicted for sections 708.6 (intimidation with a dangerous weapon, formerly terrorism) or 708.8 (going armed with intent). *Id.* § 708.2(3). The supreme court observed in *State v. Ray*, 516 N.W.2d 863, 866 (Iowa 1994), that the provision "specifically provides that punishment for assault with a dangerous weapon is inapplicable where a person

---

[5] Because we have reversed the conviction on count 1, we need not reach James's alternative argument that the conviction was against the weight of the evidence.

[6] James's only challenge to count 2 (finding defendant guilty of assault with intent to inflict serious injury, a lesser-included offense of attempted murder) is that if there is sufficient evidence to sustain the count 1 willful-injury conviction as committed against Clark, the conviction on count 2 must merge with the conviction on count 1. He makes no separate claim that the conviction on count 2 is not supported by substantial evidence, and thus, that issue is not before us.

is convicted for terrorism or going armed with intent under the same facts." In *Ray*, our supreme court noted the district court appropriately instructed the jury that if it found the defendant guilty of going armed with intent, it could not find him guilty of assault with a dangerous weapon. 516 N.W.2d at 866.

James argues the convictions for assault while displaying a dangerous weapon were charged as lesser-included offenses of intimidation with a dangerous weapon, which convictions must merge. The State concedes, stating: "Since section 708.6 applied, under section 708.2(3), James could not also be convicted of assault [while displaying a dangerous weapon]." As instructed, the assault offenses were lesser-included offenses of count 3 and must merge. *See* Iowa Code § 701.9 ("No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only."). The convictions for assault while displaying a dangerous weapon, judgment, and sentences are vacated, and we remand to the district court for entry of judgment on the conviction for intimidation with a dangerous weapon and resentencing on that conviction. *See State v. Anderson*, 565 N.W.2d 340, 344 (Iowa 1997).

*C. Merger of counts 1 and 2.*

James's argument on the required merger of counts 1 and 2 depends upon this court sustaining a conviction of willful injury.[7] *See State v. Blanks*, 479

---

[7] The State asserts, "The district court correctly merged the sentences, but erred by entering judgment on both counts."

N.W.2d 601, 606 (Iowa Ct. App. 1991). But we have found there was insufficient evidence that James caused injury to Clark to support a conviction on count 1 with respect to the victim Clark. The sentence on count 2 therefore must be vacated and the matter remanded to the district court to determine the appropriate sentence.

**AFFIRMED IN PART, REVERSED AND REMANDED FOR NEW TRIAL IN PART, JUDGMENTS AND SENTENCES VACATED, AND REMANDED FOR RESENTENCING.**

Mullins, J., concurs; Tabor, J., concurs specially.

**TABOR, J.** (specially concurring)

I agree with the outcome reached by the majority opinion. I write separately to emphasize a problem with the marshalling instruction for count one, willful injury resulting in serious injury. (The instruction is set out verbatim in the majority opinion.)

Jurors may disagree about the means of committing a single crime. *See Schad v. Arizona*, 501 U.S. 624, 636 (1991) (noting "legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes"); *State v. Bratthauer*, 354 N.W.2d 774, 777 (Iowa 1984) (finding "unanimity rule" not violated if statute defined single offense that could be committed in more than one way and alternative modes of commission were consistent with each other). But here the willful injury instruction allowed jurors to choose between two separate crimes involving two distinct injuries to two different victims. This marshalling instruction violated James's right to due process. *See Schad*, 501 U.S. at 651 (Scalia, J., concurring) (explaining when juror concurrence on the same facts would be required: "We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday."); *Lainhart v. State*, 916 N.E.2d 924, 941–42 (Ind. Ct. App. 2009) (finding jury did not reach a unanimous verdict when State alleged that defendant committed crimes against multiple victims in the disjunctive), *but see State v. Fortune*, 34 A.3d 1115, 1121-22 (Me. 2011) (upholding one count indictment that aggregated charges of attempted murder against three separate victims because defendant did not move for relief from prejudicial joinder).

The instruction problem in James's case was foreshadowed by the multi-count trial information, which failed to specify a victim for the willful-injury count. A criminal defendant may suffer a due process violation if the charging instrument does not adequately differentiate among multiple charges. *See State v. See*, 805 N.W.2d 605, 607 (Iowa Ct. App. 2011). The State's failure to differentiate was reflected in the motion for judgment of acquittal after the State's case in chief, when defense counsel stated: "I presume count 1 [willful injury] relates to Marques Jones and count 2 [attempted murder] relates to Jasman Clark." The prosecutor responded: "Your Honor, for clarification, Count 1 also relates to Mr. Clark."

Despite the prosecutor's belated clarification that he intended to aggregate the gunshot wounds to both victims into a single willful injury charge, defense counsel did not lodge an objection. On appeal, James argues, in the alternative, that his trial counsel was ineffective in handling the motion for judgment of acquittal and submission of the willful injury offense to the jury. I would reverse and remand based on that ground. Counsel should have objected to the submission of the marshalling instruction that allowed the State to allege two alternative violations of the willful-injury statute rather than alternative theories for committing a single crime.